## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BRIANNA APFELBAUM KULA, *et al.*,

        Plaintiffs,

    v.

UNITED STATES OF AMERICA,

        Defendant.

No. 4:17-CV-2122

(Judge Brann)

## MEMORANDUM OPINION

### MAY 11, 2020

## I.    BACKGROUND

Defendant United States of America's motion for summary judgment is ripe for disposition.  The Court denies Defendant's motion.

## II.    DISCUSSION

### A.    Standard of Review

I begin my analysis with the standard of review which undergirds summary judgment.  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and we think it should be interpreted in a way that allows it to accomplish this purpose."[1] Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[1]    *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

matter of law."[2] "Facts that could alter the outcome are 'material facts,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[3] "A defendant meets this standard when there is an absence of evidence that rationally supports the plaintiff's case."[4] "A plaintiff, on the other hand, must point to admissible evidence that would be sufficient to show all elements of a *prima facie* case under applicable substantive law."[5]

"The inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."[6] Thus, "if the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented."[7] "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably

---

2   Fed. R. Civ. P. 56(a).
3   *Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993) (Hutchinson, J.) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Celotex*, 477 U.S. at 322).
4   *Clark*, 9 F.3d at 326.
5   *Id.*
6   *Liberty Lobby, Inc.*, 477 U.S. at 252.
7   *Id.*

find for the plaintiff."[8]  "The judge's inquiry, therefore, unavoidably asks . . . 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"[9]  The evidentiary record at trial, by rule, will typically never surpass that which was compiled during the course of discovery.

"A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."[10]  "Regardless of whether the moving party accompanies its summary judgment motion with affidavits, the motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."[11]

Where the movant properly supports his motion, the nonmoving party, to avoid summary judgment, must answer by setting forth "genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[12]  For movants and nonmovants alike, the

---

[8]  *Id.*
[9]  *Id. (quoting Schuylkill & Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 447 (1871)).
[10]  *Celotex*, 477 U.S. at 323 (internal quotations omitted).
[11]  *Id.*
[12]  *Liberty Lobby*, 477 U.S. at 250.

assertion "that a fact cannot be or is genuinely disputed" must be supported by:
(i) "citing to particular parts of materials in the record" that go beyond "mere
allegations"; (ii) "showing that the materials cited do not establish the absence or
presence of a genuine dispute"; or (iii) "showing . . . that an adverse party cannot
produce admissible evidence to support the fact."[13]

"When opposing summary judgment, the non-movant may not rest upon
mere allegations, but rather must 'identify those facts of record which would
contradict the facts identified by the movant.'"[14]   Moreover, "if a party fails to
properly support an assertion of fact or fails to properly address another party's
assertion of fact as required by Rule 56(c), the court may . . . consider the fact
undisputed for purposes of the motion."[15]   On a motion for summary judgment,
"the court need consider only the cited materials, but it may consider other
materials in the record."[16]

In this summary judgment posture, the court is not "at liberty to disbelieve
the good faith statements of experts contained in depositions or affidavits and
presented by the non-moving party."   Further, the court cannot "resolve disputed
and relevant factual issues on conflicting affidavits of qualified experts."   As the
United States Supreme Court has instructed, "[c]redibility determinations, the

---

[13]   Fed. R. Civ. P. 56(c)(1).
[14]   *Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co.*, 311 F.3d 226, 233 (3d Cir. 2003) (Weis,
      J.).
[15]   Fed. R. Civ. P. 56(e)(2).
[16]   Fed. R. Civ. P. 56(c)(3).

weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."

Finally, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[17] "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[18] "If the evidence is merely colorable . . . or is not significantly probative, summary judgment may be granted."[19]

## B.     Undisputed Facts

With that standard outlining the Court's framework for review, I now turn to the undisputed facts of this matter.

### 1.     The September 7, 2015 Plane Crash

On September 7, 2015, a Beechcraft A36 Bonanza airplane, registration number N36HT, crashed while attempting an instrument approach to the Piedmont Triad International Airport in Greensboro, North Carolina.[20] Michael Apfelbaum was the pilot in command.[21] Apfelbaum held a private pilot certificate with an

---

[17]   *Liberty Lobby*, 477 U.S. at 249.
[18]   *Id.*
[19]   *Id.* at 249–50 (internal citations omitted).
[20]   Doc. 35 at ¶ 1.
[21]   Doc. 35 at ¶ 2.

instrument rating.[22]  Apfelbaum's wife, Christina, was a passenger on the Bonanza

airplane.[23]

Apfelbaum received six hours of flight instruction in the Bonanza airplane

from his instructor, Craig Hornberger, and was "signed off" for solo flight on

September 2, 2015.[24]  Hornberger stated that the purpose of this flight instruction

was "so [Apfelbaum] could fly [the Bonanza airplane] visually and build up

experience in the [Bonanza] airplane."[25]  On September 2, 2015, Hornberger

recommended to Apfelbaum that he not fly in actual instrument conditions – but

rather stick to visual conditions only – until he got more experience and

proficiency with flying.[26]

Apfelbaum, Christina, her father, Clarence Imgrund, and a friend, Paul

Gilbert flew from Pennsylvania to Florida on September 4, 2015.[27]  Gilbert owned

a Bonanza and had close to a thousand flight hours in the airplane.[28]  Apfelbaum

asked Gilbert to accompany him on the flight to Florida because he wanted

"somebody with some experience in flying the Bonanza to go with him."[29]  There

was "dense fog" during their departure, but visual weather conditions prevailed for

---

[22]  Doc. 35 at ¶ 4.
[23]  Doc. 35 at ¶ 3.
[24]  Doc. 35 at ¶ 6.
[25]  Doc. 34-7 at 151-52.
[26]  Doc. 34-7 at 19-20, 76, 152-53, 215-17, 238, 240.
[27]  Doc. 35 at ¶ 9.
[28]  Doc. 35 at ¶ 10.
[29]  Doc. 35 at ¶ 11.

the rest of the flight to Florida.[30]  Gilbert did not plan to fly back to Pennsylvania

in the Bonanza airplane.[31]  He testified that he would not have recommended that

Apfelbaum fly the Bonanza airplane in instrument conditions, because, according

to Gilbert, Apfelbaum "[d]idn't have enough experience" "[w]ith the equipment

and the airplane" and might become disoriented.[32]

On September 7, 2015, Apfelbaum filed an Instrument Flight Rules flight

plan for the trip from Sarasota, Florida to Greensboro, North Carolina, with a

planned departure time of about 12:18 Zulu time (7:18 a.m. local).[33]  At the time of

Apfelbaum's planned departure, instrument meteorological conditions (IMC)

existed in Greensboro.[34]  Apfelbaum had never flown an instrument approach in

the Bonanza airplane in actual instrument weather conditions before undertaking

the flight to Greensboro on the day of the accident.[35]  Apfelbaum's flight instructor

unsuccessfully tried to call him before the flight to advise, "[i]t didn't look like it

was a good day to proceed," because "it looked like it was IMC conditions

---

[30]  Doc. 35 at ¶ 12.

[31]  Doc. 35 at ¶ 13.  The parties dispute whether Gilbert thought Apfelbaum would be "fine" as long as he stayed in visual weather conditions.  *See* Doc. 35 at ¶ 13; Doc. 38 at ¶ 13.

[32]  Doc. 35 at ¶ 14.

[33]  Doc. 35 at ¶ 15.  Zulu time – more commonly known as Greenwich Mean Time – is the time at the globe's prime meridian.  Zulu is the timekeeping standard for civil aviation.  All times in the remainder of this Memorandum Opinion are expressed in Zulu time.

[34]  Doc. 35 at ¶ 16.  The parties dispute whether at the time of the flight, Apfelbaum met certain regulatory requirements for flight in IMC.  *See* Doc. 35 at ¶ 17; Doc. 38 at ¶ 17.

[35]  Doc. 35 at ¶ 18.  In disputing this, Plaintiffs refer to Apfelbaum having once taken off in instrument conditions.  Doc. 38 at ¶ 18.  The Court understands takeoff procedures to be distinct from approach procedures.

throughout and thunderstorms in Florida, and I would maybe not take the flight in IMC."[36]

At 15:32:34, Apfelbaum contacted the South Radar controller at the FAA Greensboro Air Traffic Control Tower.  The South Radar controller told Apfelbaum that "you can expect the ILS."[37]  This meant that Apfelbaum was to expect to be flying the approach into Greensboro using the Bonanza airplane's Instrument Landing System.

At that time, the terminal's Automatic Terminal Information Service was reporting a ceiling of 900 feet above the ground.[38]  Apfelbaum "consciously elected to fly in actual instrument meteorological conditions after being advised by air traffic control to expect the ILS approach."[39]

After further conversation with the South Radar controller, Apfelbaum contacted the airport's West Radar controller, Kendell Garland, at 15:44.[40]  Below is a section of their dialogue.[41]  During this conversation, Apfelbaum flew through the localizer (the instrument landing system's lateral component) without intercepting the final approach course.[42]

---

[36] Doc. 35 at ¶ 19.
[37] *See* Doc. 35 at ¶¶ 20-26.
[38] Doc. 35 at ¶ 27.  Like many airports, Greensboro has an Automated Terminal Information System (ATIS) that broadcasts the current weather information. Pilots are expected to notify controllers on initial contact that they have received the ATIS broadcast by repeating the alphabetical code appended to the broadcast, in this case, "Delta."  *See* Doc. 34-14.
[39] Doc. 35 at ¶ 28.
[40] Doc. 35 at ¶ 37.
[41] Doc. 35 at ¶¶ 38-64.
[42] Doc. 35 at ¶ 62.

- 15:45:24: Garland instructed Apfelbaum to "descend and maintain" three thousand feet.

- 15:45:28: Apfelbaum: "five to three, three six hotel tango."

- 15:48:01: Garland: "Bonanza six hotel tango, you have a primary target, one o'clock, two miles maneuvering, type and altitude unknown."

- 15:48:08: Apfelbaum: "roger, three six hotel tango is about to go IMC."

- 15:48:39: Garland: "three six hotel tango, traffic no factor, turn right, heading of zero one zero."

- 15:48:44: Apfelbaum: "zero one zero, three six hotel tango."

- 15:49:04: Apfelbaum: "level three thousand."

- 15:49:18: Apfelbaum: "would you like me to stay at three thousand, three six hotel tango?"

- 15:49:21: Garland: "that's affirmative."

- 15:50:35: Garland (clearing Apfelbaum for approach): "Bonanza three six hotel tango, niner miles from PAGAN,[43] turn right heading zero two zero, maintain three thousand until established on the localizer, cleared ILS runway five right approach."

- 15:50:45: Apfelbaum: "turning right zero two zero for PAGAN."

---

[43] "PAGAN" refers to an intersection on an airplane's final approach course.  Doc. 39-3 at ¶ 10.

- 15:50:50: Garland: "six hotel tango, and maintain three thousand, you're cleared for the ILS five right approach."

- 15:50:56: Apfelbaum: "will maintain three, cleared for the ILS five right approach."

- 15:52:48: Apfelbaum (at this point flying near the right edge of the localizer): "how do you like this route of flight?"  At this point, Garland would have expected that Apfelbaum would fly the assigned heading of 020 degrees until intercepting the localizer.[44]

- 15:52:52: Garland: "you look just a little bit right of course for the ILS, turn left heading zero, make that a three six zero, report established."

- 15:53:04: Apfelbaum: "turning left or turning right for three six zero?"

- 15:53:06: Garland: "left to three six zero."

- 15:53:09: Apfelbaum: "left to three six zero."

- 15:53:59: Garland: "Bonanza three six hotel tango you established?"

- 15:54:02: Apfelbaum: "established if I could have vectors to final please."

- 15:54:07: Garland: "uh you establi, are you established on the localizer?"

- 15:54:11: Apfelbaum: "I believe I am, three six hotel tango."

- 15:54:13: Garland: "now you look like you just actually went through the localizer."

---

[44]  Doc. 35 at ¶ 52.

- 15:54:29: Garland: "and three six hotel tango cancel your [approach] clearance, maintain three thousand, turn left heading three two zero for sequence."

- 15:54:37: Apfelbaum: "left three two zero."

By at least 15:55:04, Apfelbaum had turned the Bonanza airplane to a heading of approximately 320 degrees, as Garland had instructed.[45]  Apfelbaum flew on this assigned heading until approximately 15:57.[46]  At 15:56:43, Garland instructed Apfelbaum to "turn left heading two three zero, vector for the ILS five right."[47]  At 15:56:50, Apfelbaum replied, "two three zero, vectors for the ILS five right."[48]

It appeared to Plaintiffs' accident reconstruction expert, Colin Sommer, that Apfelbaum had been engaging the Bonanza airplane's autopilot until approximately 15:56:50.[49]  Then, according to Sommer, the airplane's autopilot disengaged "in conjunction with the instruction by ATC [air traffic control] for him [Apfelbaum] to attempt to turn to a . . . 230 heading."[50]  After the autopilot disengaged, Apfelbaum's altitude "start[ed] to go erratic," and he made a 540-

---

[45] *See* Doc. 35 at ¶ 65; Doc. 38 at ¶ 65.
[46] *See* Doc. 35 at ¶ 66.  Plaintiffs dispute Defendant's contention that Apfelbaum was flying on this heading "without losing attitude."  *See* Doc. 35 at ¶ 66; Doc. 38 at ¶ 66.
[47] Doc. 35 at ¶ 68.
[48] Doc. 35 at ¶ 69.
[49] Doc. 35 at ¶ 69.  Plaintiffs' pilot expert, Mark Fruchter, stated that he "believe[d] it was on the autopilot" and that this was the most likely scenario.  *See* Doc. 38 at ¶ 69.
[50] Doc. 35 at ¶ 70.

degree left turn with bank angles "in excess of 50 degrees."[51]  Apfelbaum and

Garland continued their communication, which culminated, regrettably, in the

Bonanza airplane's crash.[52]

- 15:57:29: Garland: "an three six hotel tango, verify you are on a two thirty

  heading."

- 15:57:35: Apfelbaum: "negative and three six hotel tango is close to."

- 15:57:57: Garland: "Bonanza three six hotel tango, you need to be level at

  three thousand, altitude shows you two thousand five hundred, Greensboro

  altimeter three zero one niner."

- 15:58:09: Apfelbaum: "six hotel tango climbing, climbing to three."

- 15:58:12: Garland: "and six hotel tango and verify you're on a two thirty

  heading now."[53]

- 15:58:40: Garland: "Bonanza three six hotel tango, Greensboro altimeter

  three zero one niner, altitude shows you two thousand niner hundred now, is

  that correct?"

- 15:58:47: Apfelbaum: "correct."

- 15:59:17: Garland: "Bonanza six three hotel tango, say current heading."

---

[51]  Doc. 35 at ¶ 71.  The parties dispute whether Apfelbaum would have maintained control of the Bonanza airplane but for disengagement of the autopilot (*see* Doc. 35 at ¶ 72 and Doc. 38 at ¶ 72), and whether the accident would have still occurred had the autopilot remained engaged (*see* Doc. 35 at ¶ 73 and Doc. 38 at ¶ 73).

[52]  Doc. 35 at ¶¶ 74-78, 80-89, 91-92, 94-103.

[53]  The parties dispute the precise course of the Bonanza airplane directly following this statement from Garland.  *See* Doc. 35 at ¶ 79; Doc. 38 at ¶ 79.

- 15:59:20: Apfelbaum: ""current heading one six six, we need a descent, we are almost disoriented, three six hotel tango."

- 15:59:28: Apfelbaum: "two thousand seven hundred."

- 15:59:35: Garland: "and three six hotel tango, can you accept a uh no gyro turn to final?"

- 15:59:40: Apfelbaum: "we can accept."

- 15:59:43: Garland: "three six hotel tango, turn uh left, left turn."

- 15:59:59: Garland: "and three six hotel tango, if you could, just maintain at least two thousand five hundred."  Garland's minimum vectoring altitude in this area was 2,500 feet above mean sea level.[54]

- 16:00:16: Garland: "and three six hotel tango, turn right, right turn, turn right."

- 16:00:22: Apfelbaum: "right turn, three six hotel tango, leveling off two thousand five hundred."[55]

- 16:00:47: Garland issued a low altitude alert to Apfelbaum but received no response.

---

[54] Doc. 35 at ¶ 89.  The parties dispute whether Apfelbaum then turned left and flew in the opposite direction before Garland could stop this turn.  *See* Doc. 35 at ¶ 90; Doc. 38 at ¶ 90.
[55] The parties dispute whether Apfelbaum then turned towards the final approach course but then descended.  *See* Doc. 35 at ¶ 93; Doc. 38 at ¶ 93.

- 16:01:24: Garland: "three six hotel tango, climb and maintain four thousand, I can see if I can get you back up into the uh, above the clouds."  There was no response from Apfelbaum.

- 16:01:35: Garland: "November three six hotel tango, Greensboro approach, you up, last altitude shows two thousand one hundred."

- 16:01:41: Apfelbaum: "three six hotel tango."

- 16:01:46: Garland: "and three six hotel tango, just climb and maintain four thousand, I'll block altitude for you."

- 16:02:06: Garland: "three six hotel tango, are you able to take that climb, uh last tops were reported at three thousand five hundred, if I can get you up to four thousand, maybe you can uh square it back off."

- 16:02:39: Garland: "Bonanza three six hotel tango, altitude shows you two thousand one hundred."

- 16:02:54: Apfelbaum: "is there a nearby field for three six ho. . .?"

- 16:02:57: Garland: ""an three six hotel tango, the nearest airport is Greensboro airport, its at your uh, off your left wing on, off of your current heading and seven miles, right now showing one thousand overcast for the ceiling."

- 16:03:21: Garland: "an three six hotel tango, what is your current uh altitude showing, reading out?"

Several individuals on the ground testified that they observed the Bonanza airplane at various points during the final minutes of the flight, before it stalled, and spun to the ground.[56]

## C.    Analysis

Plaintiffs' claim sounds in negligence under North Carolina law.[57]

### 1.    Legal Standards

#### a.    Negligence

In North Carolina, actionable negligence is the "failure to exercise that degree of care which a reasonable and prudent person would exercise under similar conditions."[58]  A negligence claim has the following "essential elements": "duty, breach of duty, proximate cause, and damages."[59]  While "[s]ummary judgment is seldom appropriate in a negligence action," a plaintiff must still "offer legal evidence tending to establish beyond mere speculation or conjecture every essential element of negligence, and upon failure to do so, summary judgment is proper."[60]  The Supreme Court of North Carolina has expressed that "it is only in exceptional negligence cases that summary judgment is appropriate, since the standard of reasonable care should ordinarily be applied by the jury under appropriate instructions from the court."[61]

---

[56]  *See* Doc. 35 at ¶ 104; Doc. 38 at ¶ 104.
[57]  *See* Doc. 34 at 20-21; Doc. 39 at 19.
[58]  *Hart v. Ivey*, 420 S.E.2d 174, 177-78 (N.C. 1992).
[59]  *Camalier v. Jeffries*, 460 S.E.2d 133, 136 (N.C. 1995).
[60]  *Hamby v. Thurman Timber Co., LLC*, 818 S.E.2d 318, 323 (N.C. App. 2018).
[61]  *Ragland v. Moore*, 261 S.E.2d 666, 668 (N.C. 1980) (citation omitted).

### b.    Intervening Cause

Under North Carolina law, an "efficient intervening cause is a new proximate cause which breaks the connection with the original cause and becomes itself solely responsible for the result in question. It must be an independent force, entirely superseding the original action and rendering its effect in the causation remote. It is immaterial how many new elements or forces have been introduced, if the original cause remains active, the liability for its result is not shifted."[62]

The Supreme Court of North Carolina has explained that "[i]n order for the conduct of the intervening agent to break the sequence of events and stay the operative force of the negligence of the original wrongdoer, the intervening conduct must be of such nature and kind that the original wrongdoer had no reasonable ground to anticipate it . . . The test by which the negligent conduct of one is to be insulated by the independent negligent act of another, is reasonable unforeseeability on the part of the subsequent intervening act and resultant injury."[63]  This means that the intervening cause must be "so highly improbable and extraordinary an occurrence in this series of events as to bear no reasonable connection to the harm."[64]  On the question of foreseeability or anticipation of the intervening cause, the Supreme Court of North Carolina has emphasized that "except in cases so clear that there can be no two opinions among men of fair

---

[62]  *Hairston v. Alexander Tank & Equip. Co.*, 311 S.E.2d 559, 566-67 (N.C. 1984) (citation omitted).

[63]  *Id.* at 567 (cleaned up).

[64]  *Id.* at 567-68.

minds, the question should be left for the jury to determine whether the intervening act and the resultant injury were such that the author of the original wrong could reasonably have expected them to occur as a result of his own negligent act."[65]

Further, it matters whether the intervening cause was itself wrongful. If the intervening cause was "not in [itself] wrongful," then "the injury is to be referred to the [original] wrongful cause, passing by those which are innocent."[66]

### c.   Contributory Negligence

"Contributory negligence is the breach of duty of a plaintiff to exercise due care for his or her own safety, such that the plaintiff's failure to exercise due care is the proximate cause of his or her injury." A "[p]laintiff may be contributorily negligent if his conduct ignores unreasonable risks or dangers which would have been apparent to a prudent person exercising ordinary care for his own safety.[67]

As with the above guidance on negligence cases in general, "[s]ummary judgment generally is disfavored in cases of . . . contributory negligence."[68] Summary judgment on such grounds may only be properly granted "where the evidence establishes the plaintiff's own negligence so clearly that no other reasonable conclusion may be reached."[69]

---

[65]   *Id.* at 567.
[66]   *Hall v. Coble Dairies*, 67 S.E.2d 63, 67 (N.C. 1951).
[67]   *Scheffer v. Dalton*, 777 S.E.2d 534, 541 (N.C. App. 2015) (cleaned up).
[68]   *Thompson v. Bradley*, 544 S.E.2d 258, 261 (N.C. App. 2001).
[69]   *Nicholson v. Am. Safety Util. Corp.*, 346 488 S.E.2d 240, 244 (N.C. 1997).

### d.   Gross Negligence

"Contributory negligence is not a bar to a plaintiff's recovery when the defendant's gross negligence, or willful or wanton conduct, is a proximate cause of the plaintiff's injuries."[70]  Gross negligence is "wanton conduct done with conscious or reckless disregard for the rights and safety of others."[71]  And an "act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others."[72]  North Carolina appellate courts have also described gross negligence as including "the absence of even slight care," "indifference to the rights and welfare of others," and "negligence of an aggravated character."[73]

### 2.   Discussion

### a.   Breach

Defendant contends that it did not breach its duty of care.  First, Defendant argues that Kendell Garland properly responded to the Bonanza airplane's drop in altitude.[74]  Second, Defendant argues that Garland's offering of a "no gyro" turn to Apfelbaum did not constitute a breach, because Apfelbaum, as the pilot, had an "absolute duty" to reject this maneuver if it was unsafe.[75]  With respect to the "no

---

[70] *Yancey v. Lea*, 550 S.E.2d 155, 157 (N.C. 2001).
[71] *Id.*
[72] *Id.*
[73] *Morgan v. Cavalier Acquisition Corp.*, 432 S.E.2d 915, 924 (N.C. App. 1993) (cleaned up).
[74] *See* Doc. 34 at 27-29.
[75] *See* Doc. 34 at 29-33.

gyro" turn, the Court finds that there is evidence upon which the jury could rely to make a finding that Garland's offer of a "no gyro" turn constituted a breach.[76]

- Richard P. Burgess, an aviation consultant with over sixty years of air traffic control, management, and consulting experience, opined in an affidavit that Garland never should have offered Apfelbaum the "no gyro" turn.[77]

- Burgess testified that Garland gave the "no gyro" instruction in an improper way.[78]  Likewise, Shawn Pruchnicki testified that Garland's "procedurally incorrect no-gyro turns" "clearly exacerbated" Garland's disorientation.[79]

- Burgess testified that Apfelbaum "had no obligation to reject" this instruction because of the "emergency conditions" that had onset.[80]  Another of Plaintiffs' experts, Marc Fruchter, echoed this opinion.[81]

### b.    Causation

Defendant criticizes the testimony from Plaintiffs' expert Pruchnicki and argues that this testimony does not suffice to establish proximate cause.[82]  I find that Defendants' critique boils down to an argument that Pruchnicki is not a credible expert witness.  As I expressed above, I lack the power to make these kinds of credibility determinations at the summary judgment phase of a case.  Therefore, I must reject this argument.

Defendant also argues that Plaintiffs have failed to establish that Garland's instructions were the cause-in-fact of Apfelbaum's loss of control of the Bonanza

---

[76]  The Court declines to rule on whether, as a matter of law, Garland's response to the drop in altitude constituted a breach.
[77]  *See* Doc. 39-3 at ¶ 32.
[78]  *See id.* at ¶¶ 33-37.
[79]  Doc. 39-4 at ¶ 16.
[80]  *See id.* at ¶¶ 38-39.
[81]  *See* Doc. 39-5 at ¶ 10.
[82]  Doc. 34 at 21-26.

airplane and of the resulting accident.[83]  I respectfully disagree—I find that there is

evidence upon which the jury could rely to find that Plaintiffs have met their

burden of proving a cause-in-fact.  This evidence is below.

- Burgess testified that Garland did not know what "IMC" stood for or what it meant in terms of a pilot's visibility,[84] and that Garland did not know what a pilot would be doing inside the aircraft when performing an ILS approach.[85] Burgess also opined that the intercept angle that Garland provided to Apfelbaum deviated from applicable standards,[86] and that without Garland's directions, the Bonanza airplane "would have landed quite easily."[87]

- Burgess testified that Garland, through his negligent directions, "set this entire sequence of events into motion."  According to Burgess, "Mr. Apfelbaum would still be alive today had he never negligently interfered. Instead, Mr. Apfelbaumps flight continued for another eleven minutes in the clouds (with numerous disorienting turns) before the crash."[88]

- Pruchnicki testified that Apfelbaum "became disorientated shortly after entering instrument conditions," and then Garland's instructions "exacerbated" his disorientation.[89]

- Pruchnicki testified that "it is clear that the lack of help from [Garland] and the instructions for excessive maneuvering caused [Apfelbaum's] final loss of control and the subsequent crash."[90]

### c. Intervening Cause

Defendant also argues that the autopilot's disengagement constituted an

intervening cause.[91]  Plaintiffs argue that there was no such intervening cause.[92]  I

---

[83]  *See* Doc. 42 at 3-7.
[84]  Doc. 39-3 at ¶ 5.
[85]  Doc. 39-3 at ¶ 7.
[86]  *See* Doc. 39-3 at ¶¶ 10-15.
[87]  Doc. 39-3 at ¶ 16; *see also* Doc. 39-3 at ¶¶ 17-19.
[88]  Doc. 39-3 at ¶ 19.
[89]  Doc. 39-4 at ¶ 11; *see also* Doc. 34-20 at 17, 24-25.
[90]  Doc. 39-4 at ¶ 22; *see also* Doc. 34-31 at 12.
[91]  Doc. 34 at 26-27.
[92]  Doc. 39 at 37-45.

find that Defendant's argument here fails for two independent reasons.  First, Defendant has not shown enough to establish this Court's summary judgment, as a matter of law, that the autopilot's disengagement was "so highly improbable and extraordinary an occurrence in this series of events as to bear no reasonable connection to the harm."  Indeed, Defendant's own accident reconstruction expert, Allen J. Fiedler, testified in his deposition that he thought "what kind of autopilot was in the aircraft" "should be noted" because he had "handled a number of cases with Honeywell King Autopilot malfunctions."[93]  Fiedler had experience dealing with different types of "autopilot system failures."[94]  And he had "investigated numerous accidents along all those autopilot series."[95]

Second, Defendant has not shown enough to establish this Court's summary judgment, as a matter of law, that the autopilot's disengagement was "wrongful" or resulted from Apfelbaum's wrongful conduct.  As an example, Defendant's argument as to Apfelbaum's contributory negligence does not assert that the autopilot's disengagement was the product of Apfelbaum's negligence.[96]

### d.   Contributory Negligence

Defendant argues that Apfelbaum was contributorily negligent because Apfelbaum lacked the requisite training or experience to perform this kind of flight, and because Apfelbaum failed to regain control of the Bonanza airplane

---

[93]   Doc. 39-17 at 11.
[94]   *Id.*
[95]   *Id.* at 58.
[96]   *See* Doc. 34 at 37-39.

after the disengagement of the autopilot.[97]  Even if the Court were to agree with

this argument, and find that Apfelbaum was contributorily negligent, the Court

cannot hold as a matter of law that Garland was not grossly negligent.  This

compels the Court to reject Defendant's argument on contributory negligence.[98]

On the issue of gross negligence, I find Plaintiffs' expert testimony and

affidavits persuasive (at least, with respect to overcoming the standard for

summary judgment).  Below is the evidence in question.

- Burgess testified that Garland's instructions after Apfelbaum said
  "established could I have vectors to final please" were needless and
  expressed a reckless indifference to the safety of the Bonanza airplane's
  occupants, because at that point, Garland had received four indications that
  Apfelbaum had lost his situational awareness.[99]

- Pruchnicki also testified that there was "ample evidence to show that
  Apfelbaum was disorientated" and that Apfelbaum had made statements that
  "clearly indicate[d] that [he] was in doubt of his" position.[100]

- Burgess testified that Garland's administering of the no gyro turn instruction
  indicated gross negligence.  As Burgess put it, "[t]he improper no-gyro
  instruction Mr. Garland provided to a disorientated pilot is perhaps the most
  egregious thing I have ever come across in my fifty plus years of experience
  in air traffic control and here Mr. Garland did it twice."[101]

---

[97]  *See id.*

[98]  Plaintiffs and Defendant argue whether the "last clear chance" doctrine applies.  If it were to
apply, it might afford Plaintiffs another escape valve from contributory negligence.  *See
Outlaw v. Johnson*, 660 S.E.2d 550, 556 (N.C. App. 2008).  But the Court's holding on gross
negligence means that the Court need not address the "last clear chance" issue at this
juncture.

[99]  Doc. 39-3 at ¶ 25; *see also id.* at ¶ 41 and Doc. 39-13 at P53.5-P53.6; *see also* Doc. 34-17 at
108-110 (deposition testimony from Burgess); *see also* Doc. 34-11 at 40-41, 168 (deposition
testimony from Fruchter concerning Garland's awareness of Apfelbaum's condition).

[100]  Doc. 39-4 at ¶ 12.

[101]  Doc. 39-3 at ¶ 37; *see also* Doc. 34-17 at 166-67 (deposition testimony from Burgess).

- Pruchnicki testified that Garland's "procedurally incorrect no-gyro turns" "clearly exacerbated" Garland's disorientation.[102]  Fruchter gave similar testimony.[103]

- Pruchnicki referred to certain of Garland's instructions as "exactly the procedure used by flight instructors to intentionally cause disorientation in students during training."[104]

## III.   CONCLUSION

The Court denies Defendant's motion.  An appropriate Order follows.


BY THE COURT:


*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[102]  Doc. 39-4 at ¶ 16.
[103]  Doc. 39-5 at ¶¶ 12-13; *see also* Doc. 34-11 at 155-56.
[104]  Doc. 39-4 at ¶ 15; *see also* Doc. 34-11 at 181-82 (like deposition testimony from Fruchter).